**In re Daniel G. KASAL, Debtor.**

**Ruth K. CASEY, Trustee, Plaintiff,**

v.

**Daniel G. KASAL, Defendant.**

**Bankruptcy No. 96–30992DAS.**
**Adversary No. 97–0250DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 20, 1998.

Michael H. Kaliner, Fairless Hills, PA, for Debtor.

Brian Cochran, Marks, O'Neill, Reilly, O'Brien & Courtney, Wilmington, DE, for Plaintiff.

Marguerite F. Kasal, Newark, DE, Pro se.

William J. Litvin, West Chester, PA, for Marguerite F. Kasal.

Gloria Satriale, Chester Springs, PA, for Trustee.

Brendan Sherman, Philadelphia, PA, for Trustee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA, for U.S. Trustee.

### OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant decision in the above-captioned proceeding ("the Proceeding") resolves the merits of a challenge to the Chapter 7 discharge of DANIEL G. KASAL ("the Debtor"), which we allowed to go forward only as an action pursuant to 11 U.S.C. § 727(a)(4)(A) on behalf of RUTH K. CASEY, TRUSTEE ("the Plaintiff"), and the Debtor's estranged wife, Marguerite F. Kasal ("the Wife"), in our Opinion of October 21, 1997, now reported at 213 B.R. 922 ("*Kasal I*") We find that the cumulative effect of the Debtor's failure to disclose (1) any as-pects of his numerous extremely questionable transactions on behalf of Casey Employment Services, Inc. ("the Business") in the year prior to his filing bankruptcy on his Statement of Financial Affairs ("the Statement"); (2) his use of late model cars allegedly belonging to his son's business; (3) his drastically reduced valuation of certain jointly-owned antiques and artwork ("the Goods"); and (4) his failure to list a coin collection, as well as his general lack of credibility, requires us to deny the Debtor's discharge.

### B. PROCEDURAL AND FACTUAL HISTORY

*Kasal I*, 213 B.R. at 924–27, provides a recitation of the unusual events preceding the trial of the Proceeding, which will not be repeated here. Essentially, in that decision we accorded the initially-reluctant Plaintiff, which had filed a timely barebones complaint invoking § 727(a)(4)(A), to join forces with the Wife, who asserted a myriad of charges against the Debtor in an earlier *pro se* letter to the court. Although we refused to treat the Wife's letter as a complaint challenging the Debtor's discharge or dischargeability of his debts to her, and therefore as sufficient to toll the Federal Rules of Bankruptcy Procedure ("F.R.B.P.") 4004(a) and 4007(c) deadlines, we permitted the Wife to participate and present evidence at trial in support of the Plaintiff's § 727(a)(4)(A) claims set forth in the Proceeding.

The order accompanying *Kasal I* scheduled the trial of the Proceeding on December 11, 1997. An unopposed continuance of the trial was granted, and the matter was rescheduled on January 20, 1998, on a must-be-heard basis, although the scheduling of another long trial on that same day pushed the trial over to January 21, 1998. A stream of witnesses, mostly on behalf of the Plaintiff, and the participation in the trial by the *pro se* Wife, who had her own agenda of wrongs to her which she wished to bring to light, slowed the trial that day to the point where it consumed over nine hours.

After the trial, the parties were invited to simultaneously submit opening briefs by February 6, 1998, and reply briefs by Febru-

ary 13, 1998. Only the Debtor submitted an opening brief. On February 13, 1998, the Wife submitted a lengthy "Answer" to the Debtor's brief, the flavor of which is probably best ascertainable from her perceptive statement that "I do not know anything about case law." The Plaintiff's counsel, who candidly admitted that this trial was his first, presented no post-trial submissions to attempt to assemble, with reference to applicable case law, the array of evidence which he presented.

We are therefore left with a large, jumbled record which bears no particular relationship to the Bankruptcy Code, let alone to § 727(a)(4)(A), the specific single statute to which, in *Kasal I*, we confined the Plaintiff and the Wife in their attack on the Debtor's discharge. However, the record does present a very unflattering portrayal of the Debtor's dealings with the Wife, the Plaintiff, and his other creditors, in which his fledgling entrepreneur son, Daniel R. Kasal ("the Son"), was an accomplice. We ultimately conclude that enough of the Debtor's dark deeds are manifested in misstatements in his bankruptcy Schedules and Statement that, combined with a rather clear intention to defraud the Wife and the Plaintiff, as well as his other creditors, a denial of his discharge under § 727(a)(4)(A) must result.

In happier times, on December 30, 1988, the Debtor and the Wife purchased the Business from the Plaintiff's predecessor. The Business provided temporary employment services to certain other businesses, designated as clients. The total purchase price of the Business was $500,000, $75,000 of which was allocated to the value of the client list. A Security Agreement and Judgment Notes totalling $284,622.50, presumably the unpaid balance of the sale price, were executed by the Debtor and the Wife. The Security was an itemized art/antiques collection acquired by the Debtor and the Wife during 20 years of marriage, the sum of the alleged value of which was totalled to be $106,194.68 in the Security Agreement.

The Business was not successful. The Debtor attributes its problems to several factors, including a business recession and the loss of a valuable client, "DuPont." Howev-

er, two other factors resulting in its demise were a personality conflict between the Debtor and the principal employee of the Business whom he inherited, Ida Sapp, professionally known as Lee Wood ("Sapp"); and the marital problems of the Debtor and the Wife. Although married for over 20 years and the parents of a young adult daughter Laura ("the Daughter") as well as the young adult Son, these parties separated in 1991, reconciled shortly thereafter, but suffered a bitter parting in 1995.

Although the Wife was co-owner on the marital home in Chadds Ford and owns a forty-five (45%) percent share of the Business, equal to the Debtor (their children each own five (5%) percent), the Debtor took control of all of the marital assets upon the parties' separation except for one Business-owned automobile, a 1988 BMW.

It should be recalled, at this point, that the Debtor filed the underlying Chapter 7 bankruptcy case on November 14, 1996. Although the Business was recognized by the Debtor to be failing and payments to the Plaintiff on the Note ceased in 1995, the Plaintiff presented evidence that the Debtor drew checks, annotated "repay loan," totalling over $46,000 from the account of the Business to himself between December 7, 1995, and June 1, 1996. In addition, the Plaintiff presented evidence of the following transfers to the Son: (1) on September 1, 1995, an assignment of an obligation of Anthony Leounes to repay commissions to the Business in the total amount of $42,883, payable in installments of $400/monthly through 2003; (2) checks, dated between December 1, 1995, and January 24, 1996, totalling over $23,500, which purported to "repay" the Son for expenses incurred in repairing and operating motor vehicles titled to the Business which the Son had used; and (3) in early 1996, transferring the client list and essentially the remaining operations of the Business to Vision Employment Services, Inc. ("Vision"), an entity then owned and operated by the Son.

The explanations of the Debtor for these actions ring extremely hollow and themselves destroy any measure of his credibility. The transfers to the Son are justified as compen-

sation for the Son's part-time employment in the Business. The Wife testified without rebuttal that she was virtually a full-time uncompensated employee of the Business and that the Daughter also worked part-time without compensation. However, no comparable transfers to them, or *any* transfers to the Wife, are noted. We therefore conclude that these were transfers without any real consideration. The largest payment by the Business to the Debtor, a $10,000 check dated April 29, 1996, was allegedly remitted for the purpose of paying future storage for the Business's records. The transfers to the Debtor himself are justified as intermediate transfers which were ultimately to be passed on by the Debtor to the Business's creditors. In support of this hypothesis, the Debtor produced a mass of bills and receipts which allegedly "proved" that he did make payments to the creditors.

However, the receipts, when examined closely, total less than $5,500. Of this total $3,500 are for legal fees, and $2,000 of the fees consist of an undated contingency fee payment to an attorney who effected a $9,000 post-petition collection on behalf of the Business shortly before the instant trial, long after the 1995 and 1996 transfers. None of these receipts support payments to store the Business's records.

Also included within these receipts, perhaps in error, were copies of receipts of two cashier's checks dated July 26, 1996, to the order of the Son and the Daughter, in the amounts of $16,000 and $2,000, respectively; and a personal check dated March 1, 1997, from the Debtor to American Communication Specialists, Inc. ("Communication"), the Son's contemporary primary corporation. The $16,000 check was described as an advance to the Son for, once again, the cost of storing the Business's records. This explanation was not credible. The check to Communication was noted as a refund for the 1988 BMW automobile. The Wife explained that the BMW, which is the sole marital asset of any substance in her possession, was the one of the several Business-owned vehicles which she desired to retain. To prevent her access to it, the Debtor had transferred the BMW's title from the Business to Com-

munication, apparently without consideration, and was compelled to re-transfer it to the Wife by order of a Delaware domestic relations court. There was, therefore, no apparent reason why the BMW was transferred to Communication in the first place and hence why it was appropriate for the Business to reimburse Communication for this vehicle when the Debtor was ordered to turn it over to the Wife.

The Debtor presently is self-employed in Kasal and Associates, a temporary employment agency which provides services similar to the Business in the West Chester area where he resides in a comfortable home with his present girlfriend. He presently has in his possession a 1995 Ford Probe automobile titled to the Business, but regularly drives a 1995 Ford Thunderbird, which is titled to Communication. Allegedly payments on the Probe are delinquent and repossession is imminent. The Thunderbird, of which the Debtor has continuously been the primary user since before he filed his bankruptcy case, is titled to and allegedly paid for by Communication. The Debtor allegedly sporadically pays the Son $400 monthly for use of this vehicle. The Wife, by way of contrast, resides with her parents in Newark, Delaware.

The Son was a college student eligible for need-based student loans in 1996 and 1997, and he testified, when called as of cross-examination, that Vision ceased doing business without making a profit within a few months after its inception. However, the Son also reported that, during 1997, Communication, which brokers cellular phones, has become very profitable and grossed in excess of $1 million. This success has purportedly allowed him to purchase not only the Thunderbird for his father and a 1997 Acura Integra for the Daughter, but also the marital home in Chadds Ford, on repurchase from the former mortgagee after a foreclosure against its former owners, the Debtor and the Wife. He presently resides there with Danielle Carpenter, his fiancée, also called as a witness by the Plaintiff. This couple is therein ensconced with much of the furniture and antiques and artwork placed in the home by the Debtor and the Wife. The

Son testified that his purchase of the home makes him the owner of all of this personality. *But see In re Wax*, 1992 WL 122899, at *4 (Bankr.E.D.Pa. May 29, 1992), citing *In re Farrier*, 61 B.R. 950, 952 (Bankr.W.D.Pa. 1986); *In re Hess*, 61 B.R. 247, 249 (Bankr. W.D.Pa.1986); *Clayton v. Lienhard*, 312 Pa. 433, 436–37, 167 A. 321, 322 (1933); and *O'Donnell v. Schneeweis*, 73 D. & C.2d 400, 403 (Pa.Com.Pl.1975) ("it is well-established that items of furniture are in no circumstances to be deemed fixtures" which would be included in a sale of realty).

There are a few other aspects of the voluminous record which bear mention. Anthony Leounes is making his $400 monthly payments to the Son on a regular basis. Sapp has been involved in litigation with the Business since she was allegedly forced out in 1989. State Trooper Shawn Kernaghan responded to a September 25, 1996, break-in reported by the Debtor at the marital home, but no items were reported stolen. This testimony was evidently entered in anticipated rebuttal of the Debtor's claim that certain of the antiques and artwork were stolen on that date, which the Wife later testified was an attempt to stage the Debtor's earlier expression to her of a plan to report the Goods stolen if the Plaintiff ever attempted to enforce its security interest in them. The Plaintiff, in rebuttal to the Debtor's claim that the client list was overpriced at $75,000, testified, to the contrary, that it was the centerpiece of the Business. He also indicated that he has not received payment on the balance owed to him, scheduled at a figure in excess of $140,000.

The only expert witness was auctioneer William Bunch, called by the Debtor. Bunch testified, from his personal inspection of some of the Goods and examining photographs of others, that the whole lot would bring only about $10,000 at one of his auctions. By way of explanation, he stated that many of the Goods were works of contemporary art which is likely to yield only a fraction of its price in the "secondary market" setting of these auctions.

Bunch's characterization, and estimate of the value, of the Goods was vigorously contested by the Wife, who claimed that many of the items were antiques and that Bunch lacked the expertise to value the Goods. She claimed that the Goods were purchased for a total of about $70,000 and were presently worth $130,000.

The Debtor agreed with the purchase figure of about $70,000 and admitted that he had valued them at over $106,000 in executing the Security Agreement to purchase the Business in 1988. In what appears to be a Financial Statement given in support of a loan application, dated August 5, 1995, the Debtor valued the Goods at $50,000, noting there that art prices were reported as depressed by the dealers from whom they were purchased and that a cost for selling the Goods must be considered. At trial, however, he attempted to justify the $10,000 figure recited in the amended Schedules, as described at pages 733 and 737–39 *infra*, citing, as his basis, essentially the same sort of considerations which caused him to value the Goods at $50,000 on the Financial Statement.

The Wife testified that, despite her pending divorce action and series of protection from abuse actions against the Husband in the Court of Common Pleas of Chester County, Pennsylvania, and in the courts of the State of Delaware, she has obtained none of the couple's marital property except the BMW. In addition to the Goods, she described a collection of approximately 150 coins dated from the 19th century given to the Debtor by his late father. On rebuttal, the Debtor replied that he did not own a coin collection and, "to the best of [his] knowledge," never owned one.

Finally, the Wife testified that the Debtor's propensity for shady dealings was one of the bases for their disagreements. In addition to the scheme to prevent the Plaintiff from realizing its collateral, she referenced his unsuccessful attempt to get her to execute a false tax return.

The only other facts in the records to be considered are the contents of the Debtor's Schedules and Statement. The Schedules disclose the following assets: the marital home, then owned with the Wife and valued at $350,000; personalty, allegedly owned

solely by the Debtor, of a $300 savings account, $20,000 in unspecified household goods and furnishings, $1,000 in jewelry, $8,000 for a life insurance policy, and $1,500 for tools. His "stock and interests" in the Business, also disclosed as owned solely by him, is valued at "0." In his Schedule C list of exemptions all of the foregoing property is claimed to be fully exempt except for the home, disclosed as having a "value exempt" of $226,238.91. The Pennsylvania state exemptions under 11 U.S.C. § 522(b)(2) are selected. It is stated that "Debtor is married," and the "exemption law" cited in support of the exemptions is "42 Pa.C.S.A.," without further embellishment.

Secured claims totalling $904,023.24 and unsecured claims totalling $36,644.49 are listed. The most prominent secured claims are those of the Plaintiff, listed at $140,190.73, a $123,761.09 home mortgage owed to Chemical Bank, and seven debts to Wilmington Trust totalling about $625,000. The Wife is listed as a co-debtor on some of the debts listed, but not as a creditor in her own right.

The Debtor reported gross income of $2,000 monthly wages as a recruiter employed by Bonifield Associates ("Bonifield"), which is netted at $1,784.50. His marital status is disclosed as "married and living together." Monthly expenses of $2,200 are reported.

The Statement, at ¶ 1, requests a debtor to list gross income from, *inter alia*, employment or operation of a business for the present and two prior calendar years. Disclosed are earnings of $20,000 from Bonifield in 1996, and negative figures, ($1,151.00) and ($2,907.00), from the Business in 1995 and 1994, respectively. Except for disclosing a $2,000 fee to his counsel and identifying the Business in response to a request regarding the "nature, location, and name of business" (¶ 16), all of the inquiries are answered "None." These inquiries include (reference is to the appropriate paragraphs of the Statement):

2. Income other than employment or operation of business.

3b. All payments within the past year to insiders.

4a. All suits in which the Debtor was a party in the past year.

7. Gifts over $200 in the past year.

10. Property transferred outside of the ordinary course of business in the past year.

14. Property held for another person.

17c. All firms or individuals in possession of books and records of the Debtor.

As we noted in *Kasal I,* 213 B.R. at 924–25, the Debtor made three amendments to his Schedules. First, on January 3, 1997, he added the Wife as an unsecured creditor and corrected her address to that where she resides with her parents. Also, after the meeting of creditors before Gloria Satriale, Esquire ("the Trustee"), on February 6, 1997, he added, on February 12, 1997, four additional unsecured creditors. Finally, on February 13, 1997, he amended his list of personalty to reduce the value of his household goods to $8,000; and, for the first time, added antiques and artwork, valued at $10,-000, wearing apparel valued at $500, and a horse valued at $500. No other amendments were offered prior to the April 7, 1997, deadline for filing complaints objecting to his discharge or dischargeability of any debts, on which date the Proceeding was filed. No further amendments have been made. The Trustee filed a no-asset report on February 6, 1997, and indicated no interest in pursuing the disclosures in the Wife's letter or the Proceeding.

## C. DISCUSSION

The Plaintiff's only allowable claim in this Proceeding, pursuant to our *Kasal I* decision, 213 B.R. at 933, arises under 11 U.S.C. § 727(a)(4)(A), which provides as follows:

(a) The court shall grant the debtor a discharge, unless—

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account. . . .

▮ The burden lies upon the plaintiff to prove grounds for denial of discharge by a preponderance of evidence. *See, e.g., In re Blanchard,* 201 B.R. 108, 114 (Bankr.E.D.Pa.

1996), citing, e.g., Grogan v. Garner, 498 U.S. 279, 282–289, 111 S.Ct. 654, 656–61, 112 L.Ed.2d 755 (1991). As we noted more specifically in In re Segal, 195 B.R. 325, 332 (Bankr.E.D.Pa.1996), a plaintiff in a § 727(a)(4)(A) action must show that (1) a false oath or statement was made by the debtor, (2) knowingly and fraudulently, (3) which was material to the course of the bankruptcy case. See also, e.g., In re Schachter, 214 B.R. 767, 773 (Bankr.E.D.Pa.1997); In re Henderson, 134 B.R. 147, 160 (Bankr.E.D.Pa. 1991); and In re Woerner, 66 B.R. 964, 971–972 (Bankr.E.D.Pa.1986), aff'd, C.A. No. 86–7324 (E.D.Pa. April 28, 1987). Moreover, in any § 727(a) action, the court must construe the section liberally in favor of the debtor in light of the fact that Congress has described the § 727 discharge provision as "the heart of the fresh start provisions of the bankruptcy law," as well as consideration of the extreme nature of a discharge denial. See H.R.REP. No. 595, 95th Cong., 1st Sess. 384 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963, 6340. See also, e.g., Rosen v. Bezner, 996 F.2d 1527, 1531 (3rd Cir.1993); and Blanchard, supra, 201 B.R. at 120.

■ However, a false oath or account, for purposes of § 727(a)(4)(A), applies not only to false statements made under sworn oath, but also is applicable to unsworn declarations under penalty of perjury, such as those made by a debtor on Official Bankruptcy Forms. See, e.g., Schachter, supra, 214 B.R. at 773; Kasal I, supra, 213 B.R. at 933; In re Main, Inc., 213 B.R. 67, 85–86 (Bankr. E.D.Pa.1997); In re Katz, 203 B.R. 227, 232–33 (Bankr.E.D.Pa.1996), aff'd, C.A. No. 97–550 (E.D.Pa. Sept. 10, 1997); Blanchard, supra, 201 B.R. at 121, 127; and 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a], at 727–36 (15th ed. rev.1997), citing 28 U.S.C. § 1746. The debtor is imposed with a paramount duty to carefully consider all questions included in the Schedules and Statement and see that each is answered accurately and

completely. See, e.g., Katz, supra, 203 B.R. at 233, citing In re Woodson, 839 F.2d 610, 614–17 (9th Cir.1988); Payne v. Wood, 775 F.2d 202, 204–07 (7th Cir.1985), cert. denied, 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); In re Hicks, 184 B.R. 954, 957 (Bankr.C.D.Cal.1995); and In re Ingle, 70 B.R. 979, 983 (Bankr.E.D.N.C.1987). Therefore, a false statement or omission made by a debtor on his Schedules or Statement constitutes a false oath or statement under § 727(a)(4)(A) which may give rise to denial of a debtor's discharge. Accord, e.g., In re Chalik, 748 F.2d 616, 618 (11th Cir.1984); and Farmers Co-op. Ass'n v. Strunk, 671 F.2d 391, 395 (10th Cir.1982).

As we indicated during the course of the trial, we were deeply offended by the Debtor's unilateral distribution of assets of the Business to the Son and himself, to the exclusion of creditors and the equal co-owner of the Business, the Wife. As of one year prior to the bankruptcy filing, i.e., as of November 14, 1995, the Business was manifested as a grossly insolvent corporation which was imminently prepared to cease operations. In such circumstances, the Debtor, officiously acting as the corporation's sole managing director, thrust himself into the role of a fiduciary for the Business's creditors. See Teasdale v. Robinson, 290 F.2d 108, 114 (8th Cir.1961); In re Bagel, 1992 WL 477052, at *12–*16 (Bankr.E.D.Pa.1992), aff'd, 22 F.3d 300 (3d Cir.1994);[1] In re Menendez, 107 B.R. 789, 792 (Bankr.S.D.Fla.1989); an Heaney v. Riddle, 343 Pa. 453, 456–57, 23 A.2d 456, 458–59 (1942). Cf. Voest–Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 217–18 (3d Cir.1990); and Brown v. Presbyterian Ministers Fund, 484 F.2d 998, 1005 (3d Cir.1973) (both holding that any corporate officers have a general fiduciary duty to that corporation's creditors and shareholders).

We find that the Debtor flagrantly violated these fiduciary duties by stripping the Busi-

---

1. This court has questioned whether that fiduciary relationship is sufficient to constitute a basis for a challenge of dischargeability under 11 U.S.C. § 523(a)(4). See In re Desiderio, 213 B.R. 99, 105 (Bankr.E.D.Pa.1997); and In re Kaplan, 162 B.R. 684, 704–05 (Bankr.E.D.Pa.1993), aff'd sub nom. Kaplan v. First Options of Chicago, 189

B.R. 882, reconsideration denied, 198 B.R. 91 (Bankr.E.D.Pa.1996). However, we have never questioned that such a fiduciary relationship indeed arises as a matter of law. We have only questioned whether the trust relationship so created by law rises to the level of a § 523(a)(4) trust relationship.

ness of its remaining liquid assets and distributing them to himself and his co-conspirator Son. We discredit entirely the Debtor's transparent attempt to justify the transfers from the Business to himself as an intermediate step in the process of payment of "real" creditors. The record shows that the Debtor took over $46,000 and paid only a few modest bills. Indeed, unless the Debtor was, as we find, stripping the Business for his own benefit, there was no reason not to direct the payments directly from the Business to the "real" creditors.

The transfers to the Son are equally as transparently improper. Direct transfers of over $39,600 (over $23,600 between December 1, 1995, and January 24, 1996, and $16,000 on July 16, 1996); the assignment of the $42,000 Leounes Note; and his turning over the Business's valuable client list to the Son's corporation were effected for what we find was no consideration whatsoever. The actual consideration appears to have been the Son's supplying the Debtor with corporate entities into which he could funnel the marital assets away from the Wife and from the Business's "real" creditors.

The foregoing actions were improper and were obviously perpetrated for the illegal purposes of depriving the co-owner-Wife of her share of the distribution of the Business's liquid assets and depriving creditors of the Business, including the Plaintiff, of payments of their indebtednesses from the Business's liquid assets. Our only hesitancy in reciting the total amount taken by the Debtor, individually and through the medium of the Son, is that we suspect that additional funds were taken which have not yet been uncovered. Examples are the $16,000 and $2,000 cashier's checks drawn to the Son and the Daughter, respectively, which were revealed only because they were apparently mistakenly included in an effort to bulk up the packet of alleged receipts of payments to "real" creditors. Like the *Schachter* debtor, the instant Debtor "impressed us as a witness lacking in credibility and possibly concealing additional assets which have not yet come to light." 214 B.R. at 223.

We therefore have no doubt of the Debtor's wrongful conduct and of his intention to engage in such conduct solely to cheat principally the Wife and secondarily the Plaintiff and other creditors of the Business. The only issue which causes us to pause in denying the Debtor's discharge is determining whether such conduct was manifested in the Debtor's Schedules and Statement such that a § 727(a)(4)(A) cause of action is proven on the instant record, swollen as it is by irrelevant material.

■ We answer this question in the affirmative. In his Schedules, the Debtor has totally ignored the opportunities provided to him to describe his access to and his receipt of the Business's liquid assets. Thus, describing his "interests" in the Business as worth "0" was false and grossly misleading. In some fashion, either as an interest of the Business or as "other personal property," such access to assets had to be disclosed as an asset of value to give an accurate portrayal of his financial picture. We note that the Debtor continues to pursue accounts receivable of the Business, as a $9,000 collection shortly before trial was admitted. While he has paid contingent fees to counsel from part of the gross sums collected, it takes little imagination to conclude that the balance went into the Debtor's pocket. In light of this activity alone, the disclosure of the value of his interests in the Business as "0" was inaccurate and misleading.

The Debtor's defense to these contentions, in addition to denials of self-benefit which we decline to credit, appears to be that these improprieties were performed by him on behalf of the Business and that he was either not obliged to disclose them on his individual Schedules because they preceded the bankruptcy or he was unaware of his responsibility to do so.

■ These arguments pale when we note the Debtor's negative responses to questions in the Statement, most of which relate to the year and, in some cases, several years prior to bankruptcy. No gross income from the Business is declared in 1996 and the seeming internal inconsistency of a negative gross income is reported in 1994 and 1995. We know, however, that the Debtor received over $20,000 gross income in 1995 and almost

$26,000 gross income from the Business in 1996 through the distributions described at page 6 *supra*. There was also evidence that he continues to receive accounts receivable collections in 1997. Claiming that the sums were not actually income because they were passed over to creditors will not avail because, first, there is no evidence that any but very modest bills were paid by the Debtor, and second, because, like those more credibly claimed by the *Schachter* debtor, *see* 214 B.R. at 771, 778–79, the amounts which came into or through his personal possession or account should have been disclosed in any event.

■ The Debtor cannot avoid disclosure on the ground that the funds received from the Business were distributions rather than income from operation of the Business. In that event the sums received should have been disclosed under paragraph 2 of the Statement (income other than from employment or operation of business).

The payments and other transfers to the Son should have been disclosed, either under paragraph 3b, concerning payments to insider creditors in the past year, since the Son clearly is an insider pursuant to 11 U.S.C. § 101(a)(i); or under paragraph 7, relating to gifts over $200. For several reasons, it is no answer to contend, as the Debtor did, that the payments came through the Business, which is a separate corporation, and that they constituted repayment of legitimate corporate debts owed to the Son. First, we find no *bona fide* debts of the Corporation to the Son. Second, the Debtor *was*, or at least purported to act as if he were, the Corporation in making these unjustified disbursements. Third, the Debtor was simply utilizing the Business as his own vehicle in making disbursements to the Son. Finally, the $16,000 cashier's check of July 16, 1996, appears to have been paid directly by the Debtor to the Son.

Since the Son was not a *bona fide* creditor of the Business, the more accurate designation of these transfers would appear to have been to classify them as gifts. The $2,000 payment to the Daughter would also appear to fall into the "gift" category. Of course, there was no disclosure of any "gifts" in

excess of $200 in the past year anywhere in the Statement.

Another alternative for disclosing the transfers to himself is presented by paragraph 10, which asks about property transferred outside of the ordinary course of business. Of course, no disclosures appear there, either.

In addition to failing to avail himself of numerous alternative means of disclosing the questionable transfers made by the Debtor from assets of the Business, other questions posed by the Statement are answered incorrectly. The litigation with Sapp is not disclosed in response to paragraph 4a, which asks the Debtor to identify all suits in which he was a party in the past year. Although the Business may have been named as the sole defendant in Sapp's litigation, the Debtor was personally a party to the numerous undisclosed pieces of litigation between him and the Wife. The motivation for this nondisclosure, combined with the false statement that he and the Wife were living together and the initial failure to list the Wife as a creditor, appears to have been to conceal his adversarial relationship with the Wife from the Trustee. This motivation might also explain his false statement that he owned all of the personalty described in the Schedules individually, although much of it and the most valuable of it, in particular the household furnishings, the art and antiques, and his stock and interests in the Business, is owned jointly with the Wife.

■ The Debtor has, presently and apparently continuously since the date of filing, possessed two late model motor vehicles, a 1995 Ford Probe and a 1995 Ford Thunderbird. As we noted in the instance of the *Katz* debtor, 203 B.R. at 224, such valuable assets must be disclosed at some place in a debtor's Schedules and Statement. If these vehicles are indeed not titled to him, as he probably truthfully claims, and therefore arguably need not be listed among his assets, these vehicles are at the least property held for another person, which were improperly omitted from mention under paragraph 14 of the Statement.

The Debtor's only rejoinder is that he was confused, that he "credibly testified" that he

did not understand this question as including the vehicles, and of course that he did not intend to defraud anyone. We cannot agree that this testimony regarding his intent, though recited, was in any sense credible. We also note that this court forwarded the Wife's letter to the Debtor's counsel on March 14, 1997, which highlighted the issue of ownership and possession of numerous motor vehicles, including the Probe and the Thunderbird, and the Debtor has never offered to amend his Schedules to correct his alleged initial "misunderstandings." We also refuse to believe that his learned counsel, himself a Chapter 7 panel trustee, would have misunderstood the correct manner of answering any of the questions on the Statement if the Debtor had provided him with accurate information.[2] Finally, we note that the Debtor refused to reveal the presence of the Business's books and records in response to the question requesting disclosure of same despite their obvious use by him in collecting accounts receivable of the Business which continued post-petition.

The foregoing discussion reveals that ample grounds for denial of the Debtor's discharge exist without even reaching the issues which generated the most controversy at trial, *i.e.*, whether the Debtor's valuation of the Goods was unreasonably low and, if so, whether there is sufficient evidence to support the conclusion that providing this low value was knowing and fraudulent conduct which would support denial of the Debtor's discharge. However, this issue of valuation of the Goods is important and presents both legal and factual questions which we will now discuss.

The legal issue presented is determining the proper standard of valuation to be applied to the Goods. As we indicated to the parties, we discussed this issue at length in *Blanchard, supra,* 201 B.R. at 128–30.

Therein, we noted that authority which is nearly uniform requires that property, and personalty in particular, must be valued on a debtor's schedules at its "fair market value" as opposed to its "liquidation value." Going against that authority to the benefit of the debtors, we opined, in *Blanchard,* that we would be willing to accept a "liquidation value" as opposed to a "fair market value" in a debtor's valuation of everyday household furnishings. *Id.* at 129. This conclusion was supported by our observation that such goods are usually very valuable to debtors, but are of negligible value in what witness Bunch would term the "secondary market." *Id.* at 129–30. Thus, they are not likely to be attractive for a trustee to liquidate.

However, we made exception for unusually valuable pieces of household furnishings, "as well as jewelry and other liquid assets." *Id.* at 130. Such property, we held, must be valued at its "fair market value" rather than its "liquidation value."

It is clear that the Goods in question are properly classified in the same category as jewelry and other liquid assets as opposed to everyday household furnishings. Therefore, they must be valued by their "fair market value" rather than by their "liquidation value."

The Debtor presents several arguments in support of the $10,000 valuation submitted in the amended Schedules, some clearer than others. The most obtuse is a citation of *Associates Commercial Corp. v. Rash,* —— U.S. ——, ——, 117 S.Ct. 1879, 1886, 138 L.Ed.2d 148 (1997), for the principle that "replacement value" is an appropriate analogue of "fair market value." It would seem to us that, if "replacement value" were the standard for valuing the Debtor's personalty, we would be obliged to consider the cost of replacing these particular Goods, which could probably only be accomplished in the retail

---

2. Other respected counsel also represented the disreputable *Schachter* debtor. We make the rather obvious observations that clients usually choose lawyers instead of vice versa and that it is the conduct of a debtor and not the debtor's counsel that is at issue in a bankruptcy case. We would note, however, that any attempts to claim dereliction of counsel as an excuse for the pervasive errors and omissions in the Statements and the Schedule, given the demonstrated competence of the Debtor's counsel, would have been,

as in *Schachter,* misplaced. *Compare In re Topper,* 229 F.2d 691, 693 (3d Cir.1956) (bad advice of counsel may be an excuse for an inaccurate declaration). *But see In re Landes,* 201 B.R. 399, 408–09 (Bankr.E.D.Pa.1996); and *In re Weber,* 99 B.R. 1001, 1015–19 (Bankr.D.Utah 1989) (certain erroneous disclosures cannot be condoned even if counsel could be chargeable with incompetence or bad advice in allowing them to occur).

art market and not the "secondary market" referenced by Bunch.

█ A clearer argument is that Bunch provided the only expert testimony regarding value and hence his valuation should be deemed the most accurate by default. In this argument, the Debtor attempts to equate the position of the Plaintiff to that of the *Blanchard* plaintiffs, who were found to have offered no evidence regarding the value of certain property at issue because their appraiser did not testify in support of an appraisal of it. 201 B.R. at 114 & n. 1, 128. However, here, we have not only the competent testimony of a co-owner of the Goods, *i.e.,* the Wife, *see, e.g., Kinter v. United States,* 156 F.2d 5, 7 (3d Cir.1946); *In re Blakey,* 76 B.R. 465, 469, *modified on other grounds,* 78 B.R. 435 (Bankr.E.D.Pa.1987); and *In re Cooper,* 22 B.R. 718, 719 (Bankr. E.D.Pa.1982) (an owner of property can always testify regarding its value), but also we have evidence that the Debtor himself valued the Goods at $106,000 in 1988, and at $50,000 in 1995, even after his alleged illusions regarding his ability to recoup the full retail value of the Goods were dissipated by his discussions with the sellers of these Goods, as he indicated in his testimony.

While we respect Bunch's expertise as an auctioneer, we do not believe that he testified convincingly that the most prudent means for disposing of the Goods would be at one of his auctions. We believe that a retail sale of the Goods would be likely to obtain a far higher return than an auction, and that the "fair market value" of the Goods must therefore approach the value which a retail sale would be likely to raise. The most conservative and yet realistic estimate of the amount which could be realized at such a retail sale was probably the $50,000 figure placed on this property by the Debtor on his 1995 Financial Statement. We believe that this figure is the amount which should have been disclosed as the value of the Goods by the Debtor, or at least as an alternative qualified by any opinion that the value was lower. Since he utilized this figure on the a Financial Statement only a year prior to filing bankruptcy, he was certainly aware of it.

Also raised by the Debtor in defense of the $10,000 figure is a claim that he believed this figure to be accurate even if it is was not so,

thus eviscerating the elements of a knowing and fraudulent depression of the Good's value on his part. This argument is not convincing for several reasons. First, there is no indication that the Debtor ever consulted Bunch or any other auctioneer in rendering his estimate of value. We find, instead, that the most convincing evidence of the Debtor's actual state of mind was his own estimate of $50,000 value on the 1995 Financial Statement. He can hardly credibly claim a lack of knowledge of this estimate. Third, the Debtor's credibility on any point is doubtful.

█ We also note that, in the initial Schedules, the Debtor failed to reference any "art objects, antiques, collections, or collectibles" at all, despite the specific entry for such directly below "household goods." Furthermore, the ultimate disclosure of "antiques and artwork," like that of "household goods," especially when the individual items had unique, appreciable values, lacks the requisite specificity. *See, e.g., In re Doyle,* 209 B.R. 897, 902 (Bankr.N.D.Ill.1997), and cases cited therein (specificity of personalty claimed as exempt is required). While we might disagree with the apparent *Doyle* holding that everyday household goods must be listed with a great degree of specificity, we certainly agree that specificity is required of any items which the debtor knows are potentially liquid assets, similar to the distinction we drew in *Blanchard, supra,* discussed at page 737 *supra,* for when "fair market value" of personalty must be used as a basis for its valuation.

In sum, we find that the Debtor's undervaluation of the Goods was knowingly and fraudulently calculated to discourage the investigation of same by the Trustee or any of his creditors. As such, this intentionally misleading disclosure adds to the cumulation of other disclosure deficiencies to support a valid § 727(a)(4)(A) claim.

Finally, the Schedules make no mention of the Debtor's coin collection identified and described with some specificity by the Wife. The Debtor's attempt at an outright denial of such a coin collection was frustrated by his qualification that he did not, "to the best of [his] knowledge," previously have any such collection. We suspect that the Debtor may have left this collection in the Chadds Ford home in the possession of the Son which,

despite the Son's and possibly the Debtor's belief in qualifying his answer as above, we noted, at page 731–32, *supra*, does not make it the property of the Son.

Ultimately the resolution of this existence or non-existence of a coin collection boils down to a swearing contest between the Wife and the Debtor. We have little doubt that the Wife, who we deem far more credible than the Debtor, should prevail in any such contest. We deem it highly likely that the Debtor or perhaps the Son is hiding the coin collection described by the Wife.

The foregoing analysis results in our finding a substantial cumulative series of misstatements in the Schedules and Statement, all to the Debtor's advantage. As in *Schachter*, 214 B.R. at 773, we find that the "pervasive and immense errors, all to the Debtor's benefit, clearly support that the violations were 'knowing and fraudulent.'" *See also In re Freedman*, 1994 WL 455030 (Bankr.E.D.Pa. Aug. 19, 1994) (discharge denied solely because of the debtor's failure to accurately disclose his income or modest bank accounts). As in *Schachter*, we suspect the presence of more items which have not come to light and we emphasize the critical nature of the Debtor's lack of general credibility. *Id.*

Although we conclude that the debtor must be denied a discharge, we hasten to note that he is in one important sense more fortunate than the *Schachter* debtor. Neither the Plaintiff, nor the Wife, nor the Trustee, nor any other party has challenged any of his claims of exemption, which, in light of the conclusions reached herein, appear doubtful in some respects, notably in his valuation of the Goods. It also appears to be too late for any party to challenge the claimed exemptions. *See* F.R.B.P. 4003(b); and *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643–45, 112 S.Ct. 1644, 1648–49, 118 L.Ed.2d 280 (1992). The Debtor will therefore pass out of bankruptcy without a discharge, but also without the loss of any assets, several of which appear properly classifiable as non-exempt.

Of course, the Goods and other possibly non-exempt property are presumably owned by the Debtor jointly with the Wife and would have been subject to sale in bankruptcy only under 11 U.S.C. § 363(h).[3] We note that the Debtor's counsel has submitted and has been granted a Fee Application for the very modest sum of $900, given the event of this Proceeding. We therefore will direct the Clerk to promptly close this case if no appeal to the accompanying Order is timely docketed.

### D. CONCLUSION

An Order effecting this opinion will be entered.

---

**3.** Like the non-debtor spouse in *In re Simeone*, 214 B.R. 537, 540 (Bankr.E.D.Pa.1997), the Wife would probably have welcomed any expeditious liquidation or other distribution of marital property because she is presently excluded from possession of almost all of it. However, since the instant parties' state court divorce proceeding has not been bifurcated and they remain legally married, it appears inconceivable that this court could possibly become involved in deciding that issue. *Compare id.* at 543–44.