In re Peter SEARS, Debtor.

Thomas R. BURRELL, Plaintiff,

v.

Peter SEARS, Defendant.

Bankruptcy No. 96–13664.
Adversary No. 97–1031.

United States Bankruptcy Court,
D. Rhode Island.

Sept. 29, 1998.

Peter J. Furness, Peabody & Brown, Providence, Rhode Island, for debtor/defendant.

Alfred A. Russo, Jr., Johnston, Rhode Island, for plaintiff.

David M. Fleury, Carmichael & Zajac, Taunton, Massachusetts, for plaintiff.

### DECISION AND ORDER DENYING DISCHARGE

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the complaint of Thomas Burrell to determine the dischargeability of his claim against Peter Sears, pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6); and his request for denial of discharge under 11 U.S.C. § 727(a)(4)(A), on the ground that Sears knowingly and fraudulently made a false oath or account in connection with this bankruptcy proceeding. Based upon the Debtor's sworn schedules, the testimony and the exhibits, we conclude that the complaint to deny the Debtor's Chapter 7 discharge should be and is GRANTED. Because the § 727(a)(4)(A) issue is dispositive, we need not examine the issues raised under §§ 523(a)(4) and (a)(6).

### BACKGROUND

Peter Sears, Thomas Burrell, and Link Murray were the shareholders in a Massachusetts corporation entitled Off–Shore Delight, Inc. (OSD), which manufactured and processed delicatessen-style seafood products. In 1991, OSD earned approximately $1,000,000 in gross sales and had a 20% profit margin. *See* Burrell's Testimony, January 13, 1998. Before long, however, the business relationship between Burrell and Sears deteriorated, and within a year it was apparent that their differences were irreconcilable. Pursuant to a buy-out agreement drafted by Link Murray, Sears agreed to pay

Burrell $1,000 per week for five years, followed by weekly payments of $400 for another five years, as well as one year of car insurance and ten years of health insurance premiums, in exchange for Burrell's stock in OSD. As security, Burrell was given a lien on OSD's equipment. In November 1991, the agreement was formalized, the stock was transferred, and Sears began making payments to Burrell. In February 1992, Burrell resigned as an officer of OSD, and in that same month Sears formed New England Off–Shore Delight, Inc., d/b/a Neptune Delight (NEOD), a Rhode Island corporation. NEOD engaged in substantially the same business as OSD, using the same type of equipment in manufacturing its product.

A couple of months later, in April 1992, Sears stopped paying under the buyout agreement and Burrell filed a breach of contract action against Sears in the Massachusetts Superior Court. Burrell also requested and obtained a restraining order preventing Sears from moving any OSD equipment or assets to Rhode Island. One month after Burrell filed the lawsuit, OSD (through Sears as its president) filed a Chapter 7 bankruptcy petition in Massachusetts where, in July 1993, the Chapter 7 Trustee filed a report of no assets, and the case was closed.[1]

On September 27, 1996, in the Massachusetts Superior Court, Justice Tierney found Sears personally liable to Burrell for breach of the 1991 agreement in the amount of $235,000, plus interest. On October 16, 1996, less than one month after the Massachusetts judgment, Sears sold NEOD, d/b/a Neptune Delight, to a New York deli operator, Howard Martin. On that date, Martin, with two business associates, visited the NEOD premises and worked out a purchase and sale agreement with Sears. Martin was interested in buying NEOD because his $5,000,000 a year New York operation needed NEOD's seafood products to remain competitive in

the deli market. *See* Martin's Testimony January 13, 1998. When Martin purchased NEOD, he changed the name of the business to Scrappy's Seafood, Inc., d/b/a Neptune's Delight Seafood, Inc. (Scrappy's). Then, less than one month after the sale of NEOD to Martin, Sears filed the instant Chapter 7 case, listing assets of $1,210 and liabilities of $284,000. *See* Debtor's Summary of Schedules.

Sears testified that after selling NEOD he worked for Excell, a communications company, marketing long distance telephone time, and that he conducted this new business from the upper floor of the two-storied condominium in which Scrappy's also operated. Although Sears insists that he was no longer involved in the seafood business, the building lease, telephone, gas and electric bills for Scrappy's remained in his name and were never transferred to Scrappy's or any other account.

Finally, Sears acknowledged that in the fall of 1997, he caused to be formed yet another corporation entitled Neptune Delight, Inc. (ND), which also produces and sells seafood products. Even by Sears' own estimate, ND's gross receipts for the three or four months of 1997 in which it operated were between $100,000 and $250,000.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The resolution of this case turns on facts which are in sharp conflict between Burrell and Sears, mainly as to the actual consideration which changed hands in the purchase and sale of NEOD, and the extent of Sears' involvement as a manager of Scrappy's.

Although the Bill of Sale and his Schedules state that Sears received only $5,000 for NEOD,[2] Burrell and Martin assert that

---

1. There was a good deal of evidence and argument presented about Burrell's purchase of the OSD assets from OSD's former landlord, Blue Gold Seafood, for $5,000. The implications sought to be attached to that transaction by Sears are not germane to this proceeding, and are best described as weak red herring.

2. Sears' answer to Question 12 of Schedule B is that he owned "*100% of P & S Seafood defunct since October 1996. No cash value. Additional info.: * Substantially all of the Corporations assets were sold for $5,000. All proceeds were paid to Corporate creditors. Corporation may have remaining rights under its lease.*" In Schedule C, Sears exempts *100% of P & S Seafood.* To Question 10 of the Statement of Finan-

NEOD was actually sold for substantially more. *See* Def.'s Ex. 22, Schedule B, Def.'s Ex. 20. Sears attempts (unsuccessfully) to explain that NEOD was only worth $5,000, which he estimated was the market value of the used equipment owned by NEOD. However, he allowed Martin to use the "Neptune Delight" trade name in Scrappy's business transactions, and he couldn't even remember whether NEOD had any accounts receivable or whether he transferred those receivables to Martin.[3] This is a high volume cash business, and as with much of his testimony, Sears' memory lapse on this item is not convincing.

Martin disputes Sears' version of the NEOD sale, asserting that the purchase price was $100,000. Martin accepted the offer, paid Sears an initial sum of $50,000 in cash on October 16, 1996, and several subsequent cash payments over the next twelve months. Martin testified that Sears later contacted him and stated that he would be willing to discount the total buy-out price to $80,000 for an immediate cash payment, to which Martin agreed. *See* Def.'s Ex. 20. Martin testified that he also paid other forms of consideration for NEOD, including: a 1997 Ford Expedition sport utility vehicle; car insurance for the Expedition; an $800 per month rental payment for Scrappy's in the office condominium building in which Sears conducted his communications business; and payment of some of Sears' telephone bills. According to Martin, Sears specifically asked that all payments be in cash because he (Sears) was contemplating filing for bankruptcy and wanted to avoid leaving a "paper trail." *See* Sears Ex. 20.

Burrell and Martin both assured the Court that Sears was intimately involved with the business after it was sold to Martin, and that Sears continued to manage the operation after the sale. Sears insists that he was no longer involved in the seafood business and that his former employee, Donna O'Keefe,

managed Scrappy's. O'Keefe testified that she became Scrappy's manager after the sale of NEOD and that she had signature authority on behalf of Scrappy's. O'Keefe also testified, however, that Sears on occasion sold small amounts of Scrappy's products to local people and kept the proceeds for himself. This supports Martin's concerns that Sears was not on the level with him. O'Keefe also testified that she overheard arguments between Martin and Sears regarding the payment of bills, and various other problems regarding the seafood business, that these arguments occurred often, but that "she didn't want to get dragged into it" or "caught up with it."

Sometime around June 1997, the relationship between Martin and Sears really soured, when Martin suspected that Sears was withholding shipments of product to Martin's New York deli, as a means of extortion. Sears, of course, denies all of this.

Fed up with Sears, Martin decided to end the business relationship in June or July of 1997. When he attempted to collect his equipment, Martin discovered that Sears had locked himself in the condominium, denying Martin access to the premises. For two days Sears remained barricaded in the building, refusing to release any of the NEOD property. *See* Martin's Testimony January 13, 1998. Martin applied for and obtained court authority to repossess Scrappy's property, which he did, with the aid of a constable. Sears admitted that he denied Martin access to the premises, with the lame explanation that he wanted to be sure that Martin would not take any of his "personal items or tools." Sears hired a lawyer who eventually negotiated a settlement with Martin, allowing Martin to retrieve his assets, including the keys to the Expedition vehicle.

### THE APPLICABLE LAW

Section 727(a)(4)(A) states that

---

cial Affairs concerning transfers within the year preceding bankruptcy, Sears states "none". Finally in Question 16 of the Statement of Financial Affairs, Sears states that he was the "sole officer and shareholder of P & S Seafood Neptune Delight." It is clear and uncontrovertible that P & S Seafood and NEOD are the same

entities that were sold to Martin. *See* Sears Exs. 10 & 22, and Joint Pre-Trial Order, p. 3.

3. This also appears to be a violation of Code § 727(a)(3) requiring business debtors to maintain records, etc.

(a) [t]he court shall grant the debtor a discharge, unless—

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

Under this section, discharge may be denied only if three requirements are met. *See Boroff v. Tully (In re Tully),* 818 F.2d 106, 110 (1st Cir.1987); *Casey v. Kasal (In re Kasal),* 217 B.R. 727, 734 (Bankr.E.D.Pa. 1998), *aff'd* 223 B.R. 879 (E.D.Pa.1998). First, the debtor must have made a false statement under oath. *See id.* Under this first requirement, it is generally recognized that the debtor's statements in the schedules are deemed to be made under oath and subject to the penalties of perjury. *See Kasal,* 217 B.R. at 734; *Montey Corp. v. Maletta (In re Maletta),* 159 B.R. 108, 112 (Bankr. D.Conn.1993). Second, the debtor's statement must have been made knowingly and fraudulently. *See In re Tully,* 818 F.2d at 110; *In re Kasal,* 217 B.R. at 734. As for the second statutory requirement, "[a] statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in it's truth, or made with reckless disregard for the truth." *Maletta,* 159 B.R. at 112 (*citing, Stamford Mun. Employee's Credit Union, Inc. v. Edwards (In re Edwards),* 67 B.R. 1008, 1010 (Bankr.D.Conn.1986)). Because the task of proving fraudulent intent through direct evidence is often a near impossibility,[4] some courts have ruled that such intent may be inferred if the false statement has not been satisfactorily explained. *See Williamson v. Fireman's Fund Ins. Co. (In re Williamson),* 828 F.2d 249, 252 (4th Cir. 1987) (" 'courts may deduce fraudulent intent from all the facts and circumstances of a case,' " *quoting, Devers v. Bank of Sheridan (In re Devers),* 759 F.2d 751, 754 (9th Cir. 1985)); *Maletta,* 159 B.R. at 112 (*citing, Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582–83 (2nd Cir.1983)). Third, the false statement must be materially related to the bankruptcy case. *See In re Tully,* 818 F.2d at 110; *In re Kasal,* 217 B.R. at 734. This requirement is met when the subject matter of the false statement bears a rational relationship to the debtor's business or the disposition of his/her property. *See Tully,* 818 F.2d at 110–111 (*citing, Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984)); *Riggs v. Cross (In re Cross),* 156 B.R. 884, 889 (Bankr.D.R.I.1993) (*quoting, Messing v. Urban (In re Urban),* 130 B.R. 340, 344 (Bankr.M.D.Fla.1991)).

 The party objecting to the discharge has the burden to show by a preponderance of the evidence that the statutory requirements have been met. *See Grogan v. Garner,* 498 U.S. 279, 282–289, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Cross,* 156 B.R. at 887; *Maletta,* 159 B.R. at 111. However, "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he [or she] has not committed the offense charged." *Tully,* 818 F.2d at 110 (*citing, In re Mascolo,* 505 F.2d 274, 276 (1st Cir.1974)); *Maletta,* 159 B.R. at 112. Like our decision in *Cross,* this is a "fact-specific proceeding, wherein the credibility of witnesses determines the result." *See* 156 B.R. at 886. *See also, Williamson,* 828 F.2d at 252 ("determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor").

### The False Statement

 We find that Sears falsely reported in his Bankruptcy Schedules that he sold NEOD (P & S Seafood) for $5,000. *See* Footnote 2. Because this statement was made in his sworn schedules, Sears is deemed to have made it under oath and subject to the penalties of perjury. *See Kasal,* 217 B.R. at 734; *Maletta,* 159 B.R. at 112. We further find that NEOD was worth much more than $5,000 and that Sears sold NEOD at a substantially higher price than admitted, with no explanation as to what happened to the proceeds. Martin's testimony supports this finding, and Sears' lack of credibility is his trademark. Very damaging to Sears is Martin's testimony that Sears agreed to sell NEOD for $100,000 (later reduced to $80,000) and that Sears requested

---

**4.** Few debtors are willing to concede that they knowingly made a false statement.

cash to facilitate the concealment of assets in anticipation of filing for bankruptcy. While, as with most witnesses, Martin's testimony was not impeccable, Sears' testimony and credibility is far less reliable, for the many reasons stated. For example, Sears testified that the essence of the NEOD sale was the transfer of some old equipment valued at $5,000. But, although not volunteered by Sears, he also transferred the "Neptune's Delight" business name. *See also* Sears Ex. 22. NEOD (d/b/a Neptune's Delight) was an established business which had been operating for four years with a substantial customer base, and the suggestion that the "Neptune's Delight" business name had no value, makes no sense. Significantly, Sears has chosen to name his current business, ND, "Neptune Delight, Inc.", further demonstrating that the trade name "Neptune's Delight" and its similar sounding predecessors have considerable going-concern value. *See* Discussion *supra* at 274–75. The record establishes without question that the business NEOD, including the equipment, the business name, the recipes, the going-concern value, and the customer base was worth significantly more than $5,000, and more likely in the neighborhood of the purchase price testified to by Mr. Martin.

Several additional circumstantial factors require these findings. In the past seven years (1991 to 1998), Sears has been an owner of at least three seafood product manufacturing companies in New England. The first of these was OSD which produced annual gross sales of $1,000,000 and a healthy annual profit of $200,000. Sears also currently owns ND which had gross sales between $100,000 and $250,000 for the first four months it was in operation in 1997. These figures are consistent with the sales of OSD and, despite the revenues produced by these two companies, Sears would have this Court believe that NEOD was sold for only $5,000. Additional testament to the value of these companies is that in 1991 Sears agreed to pay Burrell more than $360,000 for a one-third interest in OSD. Sears' history and track record with lucrative businesses in the seafood product industry completely belies his testimony in this case.

Although Sears maintains that he was neither a consultant to nor involved in the management of Scrappy's, the evidence is resoundingly against him. Martin testified that the day-to-day operation of Scrappy's remained in the hands of Sears and O'Keefe; that the condo lease, telephone, gas and electric bills all remained in Sears' name; and that he made monthly cash payments to Sears, on top of the initial outlay of $50,000. Furthermore, O'Keefe, Sears' own witness, testified that she often heard Sears and Martin arguing over business matters. Finally, Sears' effort to prevent Martin from retrieving NEOD assets in June of 1997 is telling of Sears' de facto interest in the business.

While no individual piece of evidence alone constitutes the basis for a finding that Sears has been dishonest, the entire record is more than sufficient to support the determination that Sears has made a false oath regarding the value and price he received for NEOD. *See Cross,* 156 B.R. at 886; *Williamson,* 828 F.2d at 252.

**Fraudulent Intent**

█ We next focus on whether Sears made his false statements knowingly and fraudulently, *see Tully,* 818 F.2d at 110; *Kasal,* 217 B.R. at 734, and we find that he did, indeed, knowingly and fraudulently make a false oath. First, Sears, as the owner, was in the best position to know the financial condition and value of NEOD when he sold it to Martin, and we have found that he received a down payment of $50,000, plus $30,000 in subsequent cash payments. Sears knew he was being paid more than $5,000 for NEOD and he knew that reporting this figure in his schedules was false. Secondly, Sears had the requisite fraudulent intent when he made the false statement. Because, as Judge Shiff acknowledges in *Maletta,* it is often difficult to prove fraudulent intent (debtors do not usually admit to this), 159 B.R. at 112, some courts have ruled that fraudulent intent may be inferred through "badges of fraud," and such an inference is certainly appropriate here. *See Williamson,* 828 F.2d at 252; *Maletta,* 159 B.R. at 112. Specifically, it can be inferred from all the circumstances discussed herein that Sears deliberately minimized the appearance of his

financial condition in anticipation of bankruptcy. The timing of events in this case also suggests that Sears carefully planned the concealment of the large cash payments he received and was to continue to receive from Martin. The most relevant events occurred in the following chronological order: 1) On September 27, 1996, the Massachusetts Superior Court entered a $235,000 judgment against Sears; 2) on October 16, 1996, Sears sold NEOD to Martin; 3) on November 12, 1996, Sears filed for bankruptcy. All these events occurred within the space of only two months. In addition, Sears has attempted, unsuccessfully, to portray to this Court that he no longer owned NEOD; that he received a nominal amount when he sold it; and that he has little or no income to pay creditors. Notwithstanding his denials, we find that Sears specifically asked Martin for cash payments in order to conceal these assets. With the burden having shifted to Sears to come forward with evidence that he has not committed fraud, *see Tully*, 818 F.2d at 110; *Maletta*, 159 B.R. at 112, Sears has failed totally to meet his burden.

## Materiality of the Statement

Sears' false statements bear directly on the sale price and disposition of his business enterprise, the proceeds of which are (or which should have been) an asset of this bankruptcy estate. This connection is about as material as it can get. *See Tully*, 818 F.2d at 110–111; *Cross*, 156 B.R. at 889.

## *CONCLUSION*

For the reasons set forth above, we find and conclude that when Sears reported that he sold his business, New England Off–Shore Delight, Inc./P & S Seafood, for $5,000, and when he reported that he made no transfers outside the ordinary course of business in the year preceding bankruptcy, these were false statements under oath; the statements were made knowingly and fraudulently; and the statements were materially related to his Chapter 7 bankruptcy case. Pursuant to 11 U.S.C. § 727(a)(4)(A), the Debtor's discharge is DENIED.

Enter judgment consistent with this opinion.