**In re Thomas P. MALETTA, Debtor.**

**MONTEY CORPORATION Successor-In-Interest to Allegheny International, Inc., Plaintiff,**

**v.**

**Thomas P. MALETTA, Defendant.**

**Bankruptcy No. 5–90–00533.
Adv. No. 90–5304.**

United States Bankruptcy Court,
D. Connecticut.

Oct. 4, 1993.

Thomas Goldberg, George Thomas, Day, Berry & Howard, Stamford, CT, for plaintiff.

Julie Manning, Lewis Schwartz, Schatz, Schatz, Ribicoff & Kotkin, Stamford, CT, for defendant.

## MEMORANDUM AND ORDER ON OBJECTION TO THE DEBTOR'S DISCHARGE UNDER CODE § 727(a)

ALAN H.W. SHIFF, Bankruptcy Judge.

On March 29, 1990, the defendant commenced this case under chapter 7 of the Bankruptcy Code. On July 20, 1990, Allegheny International commenced the instant adversary proceeding. The plaintiff, Montey Corporation, is the successor-in-interest to Allegheny International. The plaintiff alleges that the defendant should be denied a discharge because he made false oaths or accounts, § 727(a)(4)(A); transferred property within one year of the commencement of the case, with the intent to hinder, delay or defraud creditors, § 727(a)(2)(A); and failed to explain satisfactorily the loss of his assets, § 727(a)(5).

### BACKGROUND

The defendant was employed by Allegheny International as vice president of corporate taxation. During his employment, Allegheny loaned him over $750,000, pursuant to an executive loan program. Early in 1988, the defendant moved to Weston, Connecticut, and resided in a home (the "Weston Residence") that was purchased in his wife's name for $1,025,000. That purchase was partly funded with the proceeds from

the sale of their residence in Illinois which also was in his wife's name. The balance of the purchase price was paid with a $550,-000 note signed by the defendant and his wife and secured by a first mortgage on the Weston Residence. The defendant and his wife also established a line of credit from the Connecticut Bank & Trust Co. ("CBT") secured by a second mortgage on the Weston Residence. Mrs. Maletta has not been employed since the late 1970's and was supported by the defendant whose income paid all of the expenses and mortgage payments on the Weston Residence.

From December, 1988, until after the commencement of this case, the defendant was a vice president at Xerox Corporation, where he had worldwide responsibility for corporate taxes. His base salary as of January, 1989, was $208,000. It was increased to $240,000 on April 1, 1990. In addition, the defendant was eligible for yearly bonuses which were paid shortly after the close of the calendar year in which they were earned. He received bonuses at the beginning of 1989 and in February of 1990 that totalled after taxes approximately $65,000 and $83,600, respectively. He was also entitled to an executive allowance that totalled $11,500 in February 1990.

The defendant's home finances were handled by Mrs. Maletta. It was the defendant's practice to deposit his paychecks in their joint account. Mrs. Maletta would then transfer money from that account to her individual account at another bank from which she paid household bills and made mortgage payments. The last payment on the first mortgage before the commencement of this case reduced the joint account to $212. The defendant scheduled total liabilities of $1,785,290.00, and assets of only $28,287.52, and claimed $11,887.52 of those assets to be exempt. Plaintiff's *Exhibit # 4*, at pp. 10–11.

## DISCUSSION

■ A two-fold objective is sought by bankruptcy law and policy that governs chapter 7. Debtors are given a fresh start in the form of allowable exemptions and a discharge of dischargeable debts, and creditors are given an equitable distribution from any remaining property of the debtor's bankruptcy estate. Of course, the underlying premise in bankruptcy is that the debtor is honest and therefore entitled to that relief. Courts must scrutinize with care any challenge to that premise, and if it is shown to be unfounded, the discharge must be denied. Nothing is more corrosive to the achievement of bankruptcy objectives than the perception that creditors are unpaid or under paid while the debtor enjoys the benefit of hidden or improperly shielded assets.

■ The objecting creditor has the burden of proving that the debtor is not entitled to a discharge. Rule 4005 Fed. R.Bankr.P. In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court held that proof in § 523(a) actions must be by a preponderance of the evidence, *id.*, at 291, 111 S.Ct. at 661, and several courts have concluded that that standard is appropriate in § 727(a) proceedings. *See, e.g., In re Schroff,* 156 B.R. 250, 254 (Bankr.W.D.Mo. 1993); *In re Silverstein,* 151 B.R. 657, 660 (Bankr.E.D.N.Y.1993) (trend is to use preponderance of the evidence for all § 727(a) actions); *In re Wolfson,* 139 B.R. 279, 285 (Bankr.S.D.N.Y.1992) (illogical to apply a lower standard in § 523(a) actions than in actions under § 727(a)), *aff'd* 152 B.R. 830 (S.D.N.Y.1993); *cf., Grogan v. Garner, supra,* 498 U.S. at 289, 111 S.Ct. at 660 (in dicta the Court stated: "Congress chose the preponderance [of the evidence] standard to govern determinations under 11 U.S.C. § 727(a)(4)"); U.S.Code.Cong. & Admin.News 95th Cong.2d Sess., (1978), pp. 5787, 5884. Accordingly, I conclude that the appropriate standard in this proceeding is proof by a preponderance of the evidence.

### 1.

### § 727(a)(4)(A)

Code § 727 provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

.    .    .    .    .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account . . .

■■■■ To deny the debtor's discharge under this subsection, the plaintiff must prove that the defendant made a statement under oath; which he knew to be false; with the intent to defraud creditors or the trustee; and which related materially to the bankruptcy case. *In re Arcuri,* 116 B.R. 873, 880 (Bankr.S.D.N.Y.1990). Statements under oath include statements in documents, such as the schedules and statement of financial affairs filed under the penalty of perjury; statements that falsely value assets; and statements by the debtor during examinations under oath, such as testimony during the meeting of creditors held pursuant to § 341(a).

A debtor has an "affirmative duty" to identify all assets, liabilities and to answer all questions fully and with the utmost candor.

Creditors and those charged with the administration of the bankruptcy estate are entitled to a "truthful" statement of the debtor's financial condition. Such complete disclosure is "essential" to the proper administration of the bankruptcy case and is a "prerequisite" to the debtor's ability to obtain a discharge.

*In re Arcuri, supra,* 116 B.R. at 879–80 (citations omitted).

■■■■ A statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth. *In re Edwards,* 67 B.R. 1008, 1010 (Bankr. D.Conn.1986). Where persuasive evidence of a false statement under oath has been produced by a plaintiff, the burden shifts to the defendant to prove that it was not intentionally false, *In re Tully,* 818 F.2d 106, 110 (1st Cir.1987); *In re Arcuri, supra,* 116 B.R. at 884, and fraudulent intent may be inferred, if the false statement is

not explained. *In re Arcuri, supra,* 116 B.R. at 884. A debtor's disclosure of information previously omitted from schedules is some evidence of innocent intent, but this inference is "slight where the debtor has . . . amended his schedules after the trustee or creditors have already discovered what the debtor sought to hide." *Matter of Kilson,* 83 B.R. 198, 203 (Bankr. D.Conn.1988). Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel. *In re Kelly,* 135 B.R. 459, 462 (Bankr.S.D.N.Y.1992). Furthermore, "[a] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *In re Tully, supra,* 818 F.2d at 111.

■■■■ A plaintiff can rarely produce direct evidence of fraudulent intent; the requisite actual intent to defraud may therefore be established through proof of sufficient "badges of fraud." *In re Kaiser,* 722 F.2d 1574, 1582–83 (2d Cir.1983) (citations omitted). Such badges of fraud include reservation of rights in or the beneficial use of the transferred assets; inadequate consideration; close friendship or relation to the transferee; the financial condition of the transferor both before and after the transfer; and " 'the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors.' " *Id., quoting In re May,* 12 B.R. 618, 627 (Bankr.N.D.Fla.1980).

[W]here there has been a "pattern" of falsity, or a "cumulative effect" of falsehoods, a court may find that [fraudulent] intent has been established.

Likewise, a court may infer fraudulent intent under Code § 727(a)(4)(A) from a debtor's reckless indifference to or cavalier disregard of the truth.

*In re Arcuri, supra,* 116 B.R. at 883 (citations omitted); *In re Wolfson, supra,* 139 B.R. at 288 (if a debtor's schedules reflect a reckless indifference to the truth, no further evidence of fraud need be adduced).

■ A statement is material if it is pertinent to the discovery of assets. *Matter of Kilson, supra,* 83 B.R. at 203. Furthermore, "even if each falsehood or omission considered separately may be too immaterial to warrant a denial of a discharge pursuant to § 727(a)(4)(A) ... [a] multitude of discrepancies, falsehoods and omissions taken collectively ... [may be of] sufficient materiality to bar the Debtor's discharge." *In re Sapru,* 127 B.R. 306, 315–316 (Bankr. E.D.N.Y.1991).

■ In February 1990, just a few weeks before he commenced this chapter 7 case, the defendant received a bonus check from Xerox for the 1989 calendar year. The gross amount of that check was $104,000; the net amount after taxes was $83,600. The defendant endorsed the check to his wife, so that she could pay down the CBT line of credit. After making that payment, Mrs. Maletta drew approximately $47,000 from the line of credit, which she allegedly used to add a deck to the Weston Residence and make loans to a family friend (for which she received a note payable only to her) and their son (by three checks drawn to cash, totalling approximately $18,000, for the purchase of a home). All of those transfers were made with the defendant's knowledge and consent.

The defendant's original schedules were signed on April 20, 1990 and filed on April 25, 1990. The use of the February 1990 bonus to pay down the CBT line of credit was not disclosed in response to a question on the defendant's schedules seeking such information:

11. (a) *Payment of loans, installment purchases and other debts.*

What payments in whole or in part have you made during the year immediately preceding the filing of the original petition herein on any of the following: (1) loans; (2) installment purchases of goods and services; and (3) other debts?

(Give the names and addresses of the persons receiving payment, the amounts of the loans or other debts and the purchase price of the goods and services, the dates of the original transactions, the amounts and dates of payments...).

Plaintiff's *Exhibit # 4,* p. 3. The defendant's answer, "[v]arious payments from time to time," was non-responsive, evasive, and deliberately ambiguous. Moreover, the defendant's testimony that he was following the advice of counsel was not corroborated and is unpersuasive in light of the defendant's business experience.

The defendant admitted that the following exchange took place during the first meeting of creditors when he was examined under oath, *see* §§ 341(a), 343:

Chapter 7 Trustee:

"During the past year, have you made any extra payments to your creditors over and above your regular monthly payments?"

Defendant:

"No, sir."

The defendant's schedules disclose that the regular monthly payment to CBT on the line of credit was $1,000. Plaintiff's *Exhibit # 4,* at p. 14. He testified that for the last ten to fifteen years he had endorsed bonus checks to his wife so that she could make a payment on a line of credit or similar financial arrangement. Accordingly, he did not consider the $83,600 transfer to her for that purpose to be an extra payment to his creditors. But he knew the payment was "extra" because it was greater than his usual monthly payment. Thus, it is apparent that his response was an attempt to conceal the existence of the bonus from the trustee, who might have been able to recover it for the benefit of the estate. *See infra,* p. 114.

At the defendant's request, KPMG Peat Marwick prepared a report, completed by June 18, 1991, which was intended to trace money in and out of the defendant's and Mrs. Maletta's joint and individual accounts, including the CBT line of credit account. To assist in the preparation of

that report, the defendant informed KPMG Peat Marwick that his $83,600 bonus was used to pay down the CBT line of credit. Despite that disclosure, he testified at a deposition on July 25, 1991 that he did not know what use had been made of that money.

The defendant testified that in calculating his average current monthly income for his schedules, *see* Plaintiff's *Exhibit # 4*, p. 13, he "estimated" that he would receive a $65,000 bonus in 1990, so he added that sum to his 1989 annual salary of $208,000 and then divided the total by twelve to arrive at $22,750. The schedules provided: "If you anticipate a substantial change in your income in the immediate future, attach additional sheet of paper and describe." *Id.* Notwithstanding that direction, the defendant did not disclose that he had received a pay raise to $240,000 as of April 1, 1990, only two days after the petition filing, and 19 days *before* he prepared the schedules.

Moreover, the defendant's disclosures failed to take into account the $83,600 bonus he received in February 1990, and that omission is internally inconsistent with the data he did disclose in his schedules. The defendant's schedules stated the actual amount of the bonus he received in early 1989 ($65,000) as income he received *in 1989;* he did not include the $83,600 bonus he received in February 1990 as income for 1989. Plaintiff's *Exhibit # 4*, question 2, p. 1. When he completed the schedules in April 1990, he knew that his base salary for 1990 had been augmented by the $83,600 bonus. Consistency therefore demanded that the defendant include the $83,600 bonus as income received in 1990, and not "estimate" that bonus to be in some smaller amount. The cumulative effect of the defendant's answers on his schedules was to understate the actual amount of

both his pre- and post-petition income in 1990.

It is therefore apparent that the defendant's $83,600 bonus, which was used by his wife to pay down their line of credit which was then drawn down to make loans or gifts, was an indirect transfer by the defendant for the benefit of family and friends and should have been disclosed on the defendant's schedules. If the transfers were loans, they would have been a part of the defendant's bankruptcy estate. *See* § 541(a). If they were gifts, they might have been avoided as fraudulent transfers. *See* § 548(a). In either event the indirect transfer should have been disclosed so that the trustee could investigate a potential recovery for the benefit of creditors.[1] The failure to include the full amount of the $83,600 bonus in 1990 income furthered the concealment of that bonus and shielded the existence of pre-petition income from the trustees and creditors.

Although the defendant's post-petition income was not property of the estate, *see* § 541(a)(6), his concealment of a substantial increase in that income is another example of the defendant's concerted and deliberate attempt to obscure the source and amount of his wealth. The increase in post-petition income would have been relevant to the possible dismissal of this case for cause, *see* § 707(a). *See In re Zick*, 931 F.2d 1124, 1129 (6th Cir.1991) ("Dismissal based on lack of good faith ... should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence."); *In re Hammonds*, 139 B.R. 535, 542 (Bankr.D.Colo.1992) (dismissing chapter 7 petition as bad faith filing where the "[d]ebtor remains essentially the same businessman who is simply deter-

---

1. The defendant's schedules do not disclose any right to payment for loans. Further, the defendant answered "no" to the following question:
   12. *Transfers of property.*
      a. Have you made any gifts, other than ordinary and usual presents to family members and charitable donations, during the year

immediately preceding the filing of the original petition herein? (If so, give names and addresses of donees and dates, description, and value of gifts).
Statement of Financial Affairs for Debtor not Engaged in Business, Plaintiff's *Exhibit # 4*, p. 3.

mined not to pay his principal creditor and is using the instant bankruptcy case as yet another device to delay.'').

The defendant's schedules did not disclose the ownership of any automobiles, but he paid all of the taxes and insurance on five automobiles that were registered in his wife's name, including one that was reserved exclusively for his use. Both the defendant and Mrs. Maletta offered the transparent testimony that the automobiles were registered in her name because only she was available during the week to register them.

The defendant's schedules and statement of financial affairs, Plaintiff's *Exhibit # 4*, contains other incomplete or false statements. For example, he scheduled the value of his jewelry at $450 and his furniture at $2,500. The actual value of his jewelry, which included a gold Rolex watch, was $4,500. The defendant testified that this discrepancy was discovered prior to the deposition of Mrs. Maletta, but he did not amend his schedules to reflect that discrepancy until after the existence of this jewelry was revealed at her deposition. The Weston Residence is a 5,000 square foot house. The actual value of the furniture was at least $13,000. The defendant admitted that approximately half of the furniture was his property.

The defendant took a $9,000 distribution from his IRA account in 1990. That distribution was not disclosed to KPMG Peat Marwick and was not reflected in the report they prepared on his behalf. The defendant initially testified that he was uncertain whether the distribution was taken before the commencement of the case even though he scheduled the value of the IRA account at only $675, but, during the second day of trial, he conceded that the money was distributed prepetition. He testified that he was uncertain as to what became of the $9,000, stating only that it may have been used to pay attorney's fees. The plaintiff offered evidence suggesting that most of the $9,000 was used to pay down the CBT line of credit, because KPMG Peat Marwick could not account for

an $8,000 deficiency in that account. It is therefore likely that it should have been disclosed to the trustee at the § 341(a) meeting of creditors and in response to question 11(a) on Plaintiff's *Exhibit # 4*, see *supra*, p. 113.

The multitude of incomplete, evasive, and false statements on the defendant's statement of financial affairs leads inescapably to the conclusion that the defendant intended to mislead the trustee and defraud creditors. The defendant made false statements under oath on his schedules, at the meeting of creditors, and at the deposition on July 25, 1991, and he knew all of those statements were false when he made them. His fraudulent intent has been demonstrated by a pattern of concealment and by the fact that the transfers were made to family and friends without consideration and shortly before filing while the defendant was insolvent and subject to suit by Allegheny. The statements were material because they concerned property of the estate and its value and the defendant's good faith in filing the petition. I therefore conclude that the defendant's discharge must be denied under § 727(a)(4)(A).

**2.**

**§ 727(a)(2)(A)**

Code § 727(a) provides in relevant part: The court shall grant the debtor a discharge, unless—

.        .        .        .        .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition ...

To sustain an objection to a debtor's discharge under this subsection the plaintiff must show that the act: occurred within one year prior to the commencement of the case; was performed

with the actual intent to defraud a creditor or officer of the estate; was the act of the debtor or an agent of the debtor; and involved concealing, destroying, transferring, or removing any property of the debtor or permitting any of these acts to be done. *In re Silverstein, supra,* 151 B.R. at 660; *In re Berman,* 100 B.R. 640, 646 (Bankr.E.D.N.Y.1989). Concealment of property under § 727(a)(2)(A) means that the debtor has transferred legal title to his property to a third party while retaining a secret interest. *In re Silverstein, supra,* 151 B.R. at 661. As noted, *supra,* at p. 112, fraudulent intent may be inferred from badges of fraud. *See In re Kaiser, supra,* 722 F.2d at 1582.

■ The transfers of the $83,600 bonus funds in February and March of 1990 were within one year of the commencement of this case. As noted, *supra* at pp. 113–14, those transfers were made by the defendant or authorized by him for the benefit of his family and friends. The intent to defraud a creditor, e.g., the plaintiff, is demonstrated by the presence of numerous badges of fraud: the transfers were within 60 days of the commencement of the case; the defendant was subject to suit by Allegheny at the time of the transfers; his schedules demonstrate that he was insolvent at that time; and the CBT line of credit was used to make transfers for the benefit of family and friends.[2]

### 3.

### § 727(a)(5)

■ Code § 727(a)(5) provides that the debtor shall be granted a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." The plaintiff has the burden of introducing evidence of the disappearance of assets or of unusual transactions. The burden then shifts to the defendant to satisfactorily explain the loss or deficiency of assets. *In re Silverstein, supra,* 151 B.R. at 663. The test under this subsection relates to the credibility of the proffered explanation, not the propriety of the disposition. *Id.* An explanation is not satisfactory if it is not offered in good faith or if it is vague, indefinite and uncorroborated. *In re Potter,* 88 B.R. 843, 849 (Bankr.N.D.Ill.1988); *In re Delancey,* 58 B.R. 762, 769 (Bankr.S.D.N.Y.1986).

■ The evidence adduced at trial disclosed several transactions which implicate this subsection. The two most obvious are the defendant's prepetition withdrawal of $9,000 from his IRA account, which occurred in 1990 before the petition was filed on March 29, 1990, and the withdrawal of approximately $18,000 from the CBT line of credit account by three checks drawn to cash.

The defendant conceded that the IRA account was drawn down $9,000 prior to the commencement of the case, *see supra* at p. 115, but he did not offer any explanation as to what became of that money, other than that it "could have been for legal fees." That explanation for the deficiency in his assets was vague, indefinite and uncorroborated. The KPMG Peat Marwick report, which was completed in June of 1991 and prepared to trace the flow of cash into and out of various accounts, did not indicate the use of the three checks totaling $18,000. Mrs. Maletta testified that the money was loaned to one of their sons so that he could buy a house, but no corroborating testimony or documentary evidence was offered, despite the fact that

---

**2.** As noted, the plaintiff adduced evidence of concealment of property of the estate after the date of the petition filing, thus implicating § 727(a)(2)(B). The caption of the Second Count of the plaintiff's Second Amended Complaint Objecting to Discharge, dated September 24, 1992, refers only to § 727(a)(2)(A); however, Paragraph 10 of that complaint alleges generally that the transfers and concealments of property occurred "within one year before the date of the filing of the petition and thereafter." In view of my holding that the defendant's discharge must be denied on other grounds, I do not consider whether the complaint adequately raised issues under § 727(a)(2)(B), or if it did not, whether such issues should nevertheless be treated as if they had been raised in the complaint, *see* Rule 15(b), Fed.R.Civ.P., made applicable by Rule 7015, Fed.R.Bankr.P.

such evidence should have been readily available for that type of transaction. The lack of such evidence, together with the failure of the KPMG Peat Marwick report to trace the funds and the fact that no payee was identified on the checks, render Mrs. Maletta's explanation unsatisfactory. The defendant offered no explanation.

## CONCLUSION

Mrs. Maletta testified that the defendant commenced this chapter 7 case for the sole purpose of discharging his obligation to Allegheny. He assured her that he was not in financial difficulty and that there was no problem with any creditor except Allegheny. She described their lifestyle as somewhere between modest and lavish and stated that their lifestyle did not change prior to or after the defendant commenced this chapter 7 case. Against that backdrop, the defendant portrays himself as the innocent victim of an unfair and relentless effort by the plaintiff to deprive him of his right to a discharge.

Having considered the evidence, including the defendant's high income and bonuses and the method by which he transferred his money but had the benefit of its use to support his high life style, I conclude that he has attempted to use bankruptcy to legitimize the laundering of his income through various bank accounts so that his assets could be transferred beyond the reach of his creditors.

## ORDER

For the foregoing reasons Thomas P. Maletta's discharge is denied, and IT IS SO ORDERED.