In Re: JOHN J. McCARTHY and JENNIFER M. McCARTHY, Chapter 7, Debtors.
WILLIAM T. NEARY, U. S. TRUSTEE, Plaintiff,
v.
JOHN J. MCCARTHY and JENNIFER M. McCARTHY, Defendants.
Case No. 06-27298-jes, Adversary No. 07-2137.
United States Bankruptcy Court, E.D. Wisconsin.
August 5, 2009.

DECISION
JAMES E. ESHAPIRO, Bankruptcy Judge
On December 20,2006, John J. and Jennifer M. McCarthy ("McCarthys") filed ajoint petition in bankruptcy under chapter 7, caused by the failure of their real estate investments in Minnesota.
Some facts in this case are undisputed. The McCarthys' Minnesota real estate investments involved a scam orchestrated by Vu Le a/k/a Vihn Le (hereafter referred to as "Vu Le") and by various entities controlled by him. Vu Le's present whereabouts are unknown. It is believed that he is the subject of a pending criminal investigation in Minnesota. The question before this court is: What role, if any, did the McCarthys have in Vu Le's scam? Were they, as they contend, innocent investors who, along with other parties, were victimized by Vu Le or were they, as the U. S. Trustee and chapter 7 trustee contend, in cahoots with Vu Le in his scam?
The U. S. Trustee ("UST") and Virginia E. George ("chapter 7 trustee") assert that the McCarthys are not deserving of a discharge in this bankruptcy. It is their position that the McCarthys were voluntary and eager participants in non-arm's length transactions and that Vu Le and the entities he controlled were insiders of the McCarthys. The UST and chapter 7 trustee further contend that the McCarthys fully knew their role as straw buyers, when title to each of the various parcels of real estate was placed in their names in exchange for fees. The chapter 7 trustee also asserts that the McCarthys crossed the line with respect to pre-petition bankruptcy planning by being overly aggressive in converting non-exempt assets into exempt assets.
This adversary complaint consists of the following counts:
1. § 727(a)(4)(A) (false oath),
2. § 727(a)(5) (failure to explain loss of assets), and
3. § 727(a)(2) (fraudulent transfer of property within one year of the filing of the bankruptcy).
This is a core proceeding under 28 U.S.C. § 157(b)(2)(J), and this court has jurisdiction under 28 U.S.C. § 1334.

BACKGROUND
John J. McCarthy ("John") and Jennifer M. McCarthy ("Jennifer") are married and have two minor children. When they filed their bankruptcy petition and before their involvement with Vu Le, they owned a home in Waukesha, Wisconsin, valued at $275,000 and subject to a mortgage with a balance due of approximately $223,750. They also, at that time, owned an income property consisting of a duplex in Milwaukee, Wisconsin, valued at $90,000 and subject to a mortgage with a balance due of approximately $81,900.
The McCarthys are both in their early thirties. Jennifer currently is a real estate broker who began working at Shorewest Realtors as a real estate agent in approximately 2003 and later obtained a real estate broker's license. She is primarily involved in residential sales, with annual earnings in the range of $92,000 when this bankruptcy petition was filed. She is a graduate of the University of Wisconsin-Madison holding a bachelors degree in marketing and management. John also graduated from the University of Wisconsin-Madison, where he obtained a bachelors degree in engineering. He also holds a masters degree in engineering, which he received from Portland State University, and is currently employed at General Electric where he has worked since 2003. His annual salary at the time this bankruptcy petition was filed was in the range of $69,000-75,000.
Before the McCarthys became involved in the Minnesota real estate investments, their financial condition was stable. That situation drastically changed after they invested in the Minnesota real estate properties.

how the McCarthys became involved with vu le
In late 2005 or early 2006, the McCarthys were approached by Bryce Andrews ("Andrews"), a long-time friend of Jennifer, about an investment opportunity. Andrews and Jennifer had been in the same college business fraternity and remained good friends. Andrews told the McCarthys about an "amazing opportunity" for an investment he had with Wisdom Development Group ("Wisdom"), one of the entities controlled by Vu Le. Andrews showed the McCarthys some testimonial letters from prominent Minnesotans about this business opportunity and also displayed a spreadsheet which Andrews had created reflecting the potential profits which could be obtained from this investment opportunity. Wisdom had several alternative investment programs available for potential investors. While these programs differed with each other to some degree, they all provided for participating investors to become title owners and sign mortgages on these properties. Wisdom would make all of the financing arrangements with mortgage lenders obtained by Wisdom. The properties in these programs consisted of either vacant lots or partially developed lots owned by third parties and available for sale. Under these programs, Wisdom also arranged to have the properties fully developed as residential dwellings. All expenses in connection with these properties, including payment of the mortgages, would initially be paid by the investors who would then be promptly reimbursed by Wisdom. These expenses included not only the mortgage payments but all other expenses including construction costs, real estate taxes, and insurance. After these properties were fully developed, they would first be leased out by Property and Lease Management, LLC ("PLM"), which is another entity fully controlled by Vu Le. PLM would obtain tenants for these properties and also collect rents and maintain the properties. Approximately five years after the properties were fully completed, they would then be resold with Wisdom or another of the entities controlled by Vu Le handling the resales. The McCarthys testified that, for their part in signing as title owners and obtaining the loans, they would receive fees ranging from $1,000 per property to $3,500 per property. Later, when the properties were to be resold, they would also share in the profits from such resales. Jennifer testified that the percentage of profits which she and John were to receive upon resale would be "somewhere around 35 percent." (February 4,2009 Tr. p. 160, line 7) Everything else that would be involved in these programs would be handled by Wisdom or one of Vu Le's other controlled entities. Wisdom drafted all of the agreements it entered into with the McCarthys.
Andrews told the McCarthys that, based on his experience, Wisdom had fully complied with all of its responsibilities, including reimbursement for any expenses including the mortgage payments which he incurred. The McCarthys, in reliance upon what they were told by Andrews, decided to invest with Wisdom and signed all of the agreements prepared by Wisdom without these documents first having been reviewed by legal counsel. During March and April of 2006, the McCarthys purchased four separate parcels of real estate  all located in Minnesota  as follows:

12th Avenue Property
This was the first transaction and involved the purchase of a vacant lot located at 2500  12th Avenue South, Minneapolis, Minnesota. This parcel was purchased solely in the name of John[1] at a price of $70,000. A $358,500 mortgage loan was obtained from the Bank of Cherokee, which was used, in part, to pay the $70,000 purchase price. The McCarthys understood that other withdrawals from this loan would be needed for anticipated construction costs. $25,000 was paid to Acquisition Services, another Vu Le controlled entity, for construction. However, no construction was ever commenced. The full amount borrowed on this loan, including the purchase price of the lot, totaled $105,950. John received a fee of $2,500 for placing title to this property in his name. When John was asked what was the purpose of this fee, his response was: "for bringing our creditworthiness to the table as investors." (February 5, 2009 Tr. p. 23, lines 8-11)

1606 and 1608 Woodbridge. St. Paul. Minnesota
The next purchases made by the McCarthys consisted of two side-by-side townhouses which were nearly fully developed, except for completion of landscaping and construction of a driveway. Jennifer's friend, Andrews, was the seller of these townhouses. The McCarthys testified that, after the purchases of these properties, they discovered that what had been represented in the plans for these townhouses as containing three bedrooms in each townhouse contained only two bedrooms in each townhouse. Mortgages of $23 8,000 were obtained for each townhouse. A portion of each mortgage loan was funded by Countrywide for $190,400 and the balance of each mortgage loan of $47,600 was funded by Homecomings Financial. Title to each townhouse was put in the names of both John and Jennifer who received a fee of $3,500 for each townhouse. None of the remaining construction promised to be completed was ever performed. John also testified that appliances would be put in each townhouse, but no appliances were provided. Neither townhouse was ever leased. The McCarthys testified that there was a $26,920 withdrawal made to Wisdom. They stated that they did not know why this withdrawal was made because no further construction was performed on either townhouse after the purchases. Andrews never told the McCarthys how much he made from the sales of these townhouses to the McCarthys. However, at the trial, Andrews stated he received $2,500 in the aggregate from the sales. (February 4,2009 Tr. p. 184, lines 10-14)

5th Avenue Property
The final transaction involved a purchase of a vacant lot at 26XX  5th Avenue, St. Paul, Minnesota, bought for $120,000. At the closing, Acquisition Services, another entity controlled by Vu Le, received at least $12,500 which the McCarthys understood would be used for closing costs and anticipated costs of construction for this property. No construction was ever started on this property. Jennifer purchased this property in her name only and received a $1,000 fee. This transaction was funded by a mortgage with FCC Acquisition Corp.[2] The total amount obtained from the mortgage loan, including the purchase price of the lot, was approximately $147,000. (February 4, 2009 Tr. p. 73, lines 6-16)

WHAT HAPPENED AFTER THE PURCHASES?
In late June or early July of 2006, these Minnesota investments started to unravel. The McCarthys began receiving only partial reimbursement for mortgage payments which they made. By the end of August of 2006, Wisdom discontinued making all further reimbursements to the McCarthys.
The McCarthys testified that Wisdom paid them a total of $23,481.30 of which $10,500 consisted of the fees, with the balance as reimbursement for mortgage payments and miscellaneous other expenses which they made. The total amount which the McCarthys paid was $28,936.35, leaving them with a deficit of $5,455.05 (Plaintiffs exhibit 29). But the worst was yet to come.
In late July of 2006, the McCarthys met with Vu Le in Minnesota. This was their first and only meeting with him in person. They inquired why they were not being fully reimbursed for payments which they made and why the properties were not being developed. Jennifer testified that Vu Le failed to provide them with a satisfactory response.
Around the middle of December of 2006, a mortgage foreclosure proceeding was commenced by The Bank of Cherokee against the McCarthys in connection with the 12th Avenue property. The McCarthys tried to surrender this property to The Bank of Cherokee in lieu of foreclosure. They made this same attempt with the other mortgage lenders with respect to the other Minnesota parcels of real estate. However, all of these efforts failed. They then considered other alternatives, including selling the properties or developing them on their own. None of their options panned out. The McCarthys finally realized that their only recourse was to file a chapter 7 petition in bankruptcy.
The McCarthys' bankruptcy petition includes a combined unpaid balance due to the various mortgage lenders on these Minnesota properties in the amount of approximately $728,000. In addition to the mortgage foreclosure brought on the 12th Avenue property by The Bank of Cherokee, mortgage foreclosure proceedings were also commenced with respect to the Woodbridge properties. No mortgage foreclosure proceedings have, as yet, been started in connection with the 5th Avenue property. The McCarthys testified that they also lost their investment property in Milwaukee through mortgage foreclosure.

LAW
The court recognizes that a denial of a debtor's discharge is an extreme remedy and that denial of such discharge must be construed liberally in favor of the debtor. In re Koss. 403 B.R. 191 (Bankr. D. Mass. 2009). At the same time, however, the court also recognizes that a discharge is not a right but is a privilege and is available only to honest debtors. Id. at 215. The burden of proof for denial of discharge is upon the UST to establish grounds for denial of discharge by a preponderance of the evidence. In re Serafini. 938 F.2d 1156 (10th Cir. 1991).

FALSE OATH  SEC. 727(a)(4)(A)
Under § 727(a)(4)(A) (false oath or account), the U. S. Trustee must prove:
1. debtor made a statement under oath,
2. which was false,
3. debtor knew statement was false,
4. the statement was made with a fraudulent intent, and
5. statement related materially to the bankruptcy case.
In re Beaubouef. 966 F.2d 174,178 (5th Cir. 1992). Omissions from the bankruptcy schedules and Statement of Financial Affairs constitute a false oath for purposes of § 727(a)(4). In re Hamilton, 390 B.R. 618, 625 (Bankr. E.D. Ark. 2008) ("Omissions from schedules qualify as a false oath if they are made knowingly and with fraudulent intent."); In re Glenn. 335 B.R. 703,707 (Bankr. W.D. Mo. 2005); In re Bostrom. 286 B.R. 352, 360 (Bankr. N.D. 111. 2002).
In this case, the chapter 7 trustee testified that there were numerous omissions from the debtors' schedules and Statement of Financial Affairs ("SOFA"), including the following:
1. Schedule G. Although the McCarthys disclosed the various agreements entered into with Wisdom and PLM, the chapter 7 trustee contends that these disclosures were "kind of skiddy on characterization" (February 4,2009 Tr. p. 227, lines 21-22). In her opinion, the disclosures made were not an accurate or truthful statement of the McCarthys' interest in these properties.
2. Questions 1 and 2 of SOFA. Failure to disclose the $10,500 fees which the McCarthys received from Wisdom.
3. Question 10 of SOFA. Failure to disclose preferential transfers.
4. Question 14 of SOFA. Failure to disclose property held for another person.
5. Question 21 of SOFA. Failure to disclose the McCarthys' partnership interest.
With respect to the chapter 7 trustee's assertions of inaccuracies in Schedule "G," she did acknowledge that the supporting documents she requested from the McCarthys to more accurately explain the nature of their involvement in the Minnesota properties were voluntarily turned over to her before the adjourned § 341 meeting of creditors held on February 20,2007. It is well established that the court may consider the debtor's subsequent voluntary disclosure as evidence of innocent intent. In re Kelly. 135 B.R. 459, 461 (Bankr. S.D. N.Y. 1992); In re Giquinto. 388 B.R. 152, 181 (Bankr. E.D. Pa. 2008).
With respect to the lack of disclosure of fees which the McCarthys received, Atty D. Alexander Martin, who prepared the McCarthys' bankruptcy petition and schedules, testified that the reason these fees were not disclosed in either Questions 1 or 2 of SOFA was because he "missed it." (February 5, 2009 Tr. p. 179, line 20) Atty Martin also testified that he did not include any preferences in Question 10 of SOFA because he concluded that the McCarthys' debts, being primarily non-consumer debts, did not include any payments in excess of $5,000, which was the prerequisite amount to qualify as a preferential payment within the meaning of § 547(c)(9) when this bankruptcy case was filed. Atty Martin further stated that this was a complicated case which required an emergency filing and added: "At the time I filed, I thought it was my best work. Looking back on it, I could have improved; I could have done better." (February 5,2009 Tr. p. 180, lines 5-7) Atty Martin also stated that he answered Questions 14 and 21 of SOFA as "none" because he reached the conclusion that the debtors were not partners with Vu Le. The court is aware that one of the exhibits in this adversary proceeding is an agreement in connection with the 5th Avenue Property between Property Lease Management LLC and Jennifer labeled a "Partner Agreement," and which also referred to Jennifer as "Partner". However, the record in this case persuades the court that neither Jennifer nor John had any control over any of the parcels of real estate they purchased. It is well established that the bankruptcy court is not bound by labels given to a debt in the parties' agreement. 6 Collier on Bankruptcy ¶ 523.11 [6][a] (15th ed. rev.). Mark Dorman, a 25-year veteran investigator for the Wisconsin Department of Revenue assigned to the task of investigating possible security violations involving Vu Le, testified that: "[i]f s very common for investors to be referred to as partners in schemes involving securities transactions." (February 5, 2009 Tr. p. 94, lines 1-4).
This case turns on the credibility of the McCarthys in deciding if they were innocent investors duped by a con artist, or were more deeply involved with Vu Le in a scheme. The chapter 7 trustee testified that it is simply unbelievable that the McCarthys, in view of their educational background and business expertise: "... would risk incurring a million dollars in debt to get $2,500 on each of the parcels. It never made any sense to me." (February 4,2009 Tr. p. 250, lines 18-21) Fraudulent intent is a difficult element to establish because, generally, it is the debtor or debtors who are the only persons able to testify as to their true intent. In this case, the court, having had an opportunity to observe and evaluate the demeanor of the McCarthys, was impressed by their credibility and is persuaded that there was no fraudulent intent on their part.
The most compelling testimony which supports this conclusion with respect to credibility was presented by Dorman. He stated that he had interviewed the McCarthys to establish their credibility as well as the credibility of other investors with Vu Le and concluded that the McCarthys were only passive investors and victims of the scam perpetrated by Vu Le. (February 5, 2009 Tr. p. 89, line 12) He further testified that the fees paid to the McCarthys were part of a "lulling technique to have them thinking they were actually in a legitimate investment." (February 5, 2009 Tr. p. 95, lines 23-25) Dorman added that people who are "smarter, richer, and more successful" than the McCarthys also lost money in these types of schemes. (February 5, 2009 Tr. p. 100, lines 2 and 3) He concluded by stating that the McCarthys had no control over the promised construction of the various real estate properties which they had purchased in their names, and in his opinion, this was not a straw man scheme because the McCarthys were not conscious of their role in this scheme.
The lesson learned from this case is that even intelligent people, like the McCarthys, can be duped by a clever con artist.
Recently, in In re Guillet. 398 B.R. 869 (Bankr. E.D. Tex. 2008), the court concluded that the debtor, a doctor by occupation who had previously been involved in various business enterprises, was a victim of a scam rather than a perpetrator in the scam. The court, finding that the debtor was truthful and credible in his testimony and entitled to a bankruptcy discharge, declared: "financial victims, no matter how desperate, foolish, or stupid, should not be financially punished for their ineptitudes." Id.at 891.
Any omissions from the McCarthys' schedules resulted from unintentional mistakes and not from any fraudulent intent on their part. Atty Martin has accepted full responsibility for omissions which should have been included in the bankruptcy schedules. This is in sharp contrast to what occurred in In re Dailey, 405 B.R. 386 (Bankr. S.D. Fla. 2009). In Dailey, the debtor attempted to blame his former bankruptcy counsel but failed to call that counsel to testify at the trial. The court in Dailey stated that the debtor's failure to have his former attorney testify caused the court to draw an adverse inference from such failure, and the debtor was denied a discharge. In the case at bar, however, the McCarthys did call Atty Martin, who had prepared the bankruptcy petition and schedules, to provide testimony.
The UST has failed to establish by a preponderance of the evidence all the elements necessary for denial of discharge under § 727(a)(4)(A).

SEC. 727(a)(5)
Under § 727(a)(5), proof of fraudulent intent is not required. What must be shown is that the McCarthys failed to satisfactorily explain a loss of assets or a deficiency of assets. Initially, the UST, as the objecting party, must show that the McCarthys at one time owned substantial and identifiable assets which are no longer available to their creditors. In re Bostrom, 286 B.R. 352, 364 (Bankr. N.D. 111. 2002); In re Stamat, 395 B.R. 59, 76 (Bankr. N.D. 111. 2008). Once this showing has been made, the burden then shifts to the debtor or debtors to provide a satisfactory explanation for the unavailability of the assets. Stamat. 395 B.R. at 76. Stamat further states that courts are not concerned with the wisdom of a debtor's disposition of assets and income but instead focuses upon the truth ofthe debtor's explanation. See also In re Maletta. 159 B.R. 108, 116 (Bankr. D. Conn. 1993) ("The test under this subsection relates to the credibility ofthe proffered explanation, not the propriety ofthe disposition.")
The UST did not make the initial prerequisite showing that substantial and identifiable assets are no longer available to the McCarthys' creditors. The court is persuaded that the purchase prices paid by the McCarthys for the various parcels of real estate were well in excess of their then fair market values. The inflated purchase prices paid for the Minnesota properties were part ofthe scam perpetrated upon the McCarthys by Vu Le. When John was asked at the trial by his attorney if there were any assets lost or dissipated, he responded:
No. I mean, the question is really the property never had the value  they never had the asset. I mean, they were appraised for more than what actual value there was. There never had a loss of assets; they simply didn't have them. The properties were never finished.
(February 5, 2009 Tr. p. 117, lines 8-13). Even had the UST overcome this hurdle, the court concludes that the McCarthys were truthful in explaining what occurred, to the best of their ability. They fully cooperated with the UST and Chapter 7 Trustee in promptly turning over all documentation in their possession when asked to do so.
The court concludes that denial of discharge under § 727(a)(5) has not been established.

SEC. 127(a)(2)-FRAUDULENT TRANSFER OR CONCEALMENT OF PROPERTY
The UST's third count for denial of discharge is grounded upon its contention that the McCarthys transferred certain assets from non-exempt funds into exempt funds, consisting of the following:
1. $2,500 transferred on October 9, 2006 and
2 $7,400 transferred on December 13, 2006.[3] in violation of 11 U.S.C. § 727(a)(2).
The McCarthys have responded by stating that these transfers were made upon advice of their bankruptcy counsel.
Sec. 727(a)(2) requires proof of the following elements:
1. act complained of done within one year before filing of bankruptcy petition,
2. act was done with actual intent to defraud,
3. act was done by the debtor, and
4. act consists of transferring or concealing property of the debtor. Pre-bankruptcy planning is, in and of itself, not improper. As noted in Collier on
Bankruptcy, both the House and Senate Reports validate this approach by stating the following:
As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors and permits the debtor to make full use of the exemptions to which he is entitled under the law.
6 Collier on Bankruptcy 1727.02[3][f] (15th ed. rev.), citing 50 H.R. Rep. 595, 95th Cong. 1st Sess. 361 (1977), reprinted in App. Pt. 4(d)(1) infra; S. Rep. No. 989, 95th Cong., 2d Sess. 76 (1978), reprinted in App. Pt. 4(e)(1) infra. However, where a conversion is made with the intent to defraud creditors, such conversion is objectionable and may provide a basis for denial of discharge under § 727(a)(2). In re Smiley, 864 F.2d 562 (7th Cir. 1989). Smiley also recognizes that conversions of assets from non-exempt to exempt forms within a year preceding a petition in bankruptcy are not necessarily fraudulent, and whether § 727(a)(2) applies depends on the facts and circumstances of each case.
The record in this case shows that the McCarthys established a pattern over the years of periodically setting aside some of their funds for retirement purposes. Moreover, the total amount in this case ($9,900) is not excessive. This court in In re Bogue. 240 B.R. 742 (Bankr. E.D. Wis. 1999), concluded that where a debtor placed $17,800 into exempt annuity contracts it was not an exorbitant amount. The court is also persuaded that the McCarthys reasonably relied on the advice of their bankruptcy counsel in making these pre-bankruptcy transfers and that such reliance has negated the element of fraudulent intent required in § 727(a)(2).
Because the transfer of these funds by the McCarthys was not made with actual intent to defraud creditors, denial of discharge under § 727(a)(2) is not warranted.

CONCLUSION

The UST has not established, by a preponderance of the evidence, that the McCarthys should be denied a discharge under § 727(a)(2), § 727(a)(4), or § 727(a)(5). This adversary complaint is dismissed, with prejudice, and the McCarthys shall be granted a discharge.
The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Federal Bankruptcy Rule 7052.
A separate order dismissing this adversary proceeding shall be issued.
NOTES
[1] When John was asked why he purchased this property only in his name, his response was: "We were looking at getting  you know, purchasing multiple properties. We were under the understanding that in order to  you know, in order to do multiple investments for properties, that if we had everything in both of our names it could limit our potential for acquiring more properties." (February 5, 2009 Tr. p. 10, lines 20-25)
[2] FCC Acquisition Corp. and Acquisition Services are two separate entities. FCC Acquisition Corp. is not controlled by Vu Le, while Acquisition Services is a Vu Le controlled entity.
[3] In addition, there was a third transfer of $1,800 on December 21, 2006, which was made one day after the McCarthys filed their bankruptcy petition. This transfer has not been challenged by the chapter 7 trustee, who has since filed a no asset report in this case.